IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| VOLVO GROUP NORTH AMERICA, LLC d/b/a VOLVO TRUCKS NORTH AMERICA, a Delaware limited liability company, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16-cv-114 |
| FORJA DE MONTERREY S.A. de C.V., A Mexican company, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Loretta C. Biggs, District Judge.

Volvo Group North America, LLC ("Volvo") initiated this breach of contract action against Forja de Monterrey S.A. de C.V. ("Forja"). (ECF No. 1.) Forja counterclaimed for improper contract termination, fraudulent inducement, and violation of contractual exclusivity. (ECF No. 111 at 24–26.)

Before the Court are competing motions for summary judgment.[1] Volvo moves for summary judgment on Forja's counterclaims and the lost profits and punitive damages sought in connection with those claims. (ECF No. 135.) Forja, for its part, requests summary judgment on its own counterclaims, as well as Volvo's original breach-of-contract claim. (ECF No. 149.) For the reasons that follow, (1) summary judgment will be granted in Volvo's favor on two of Forja's counterclaims—fraudulent inducement and violation of exclusivity—and

---

[1] The parties have also filed a joint motion to seal in connection with the instant motion, (ECF No. 169), which will be addressed by separate order.

Forja's request for punitive damages; (2) the parties' motions on Forja's remaining counterclaim—improper termination—and Volvo's breach-of-contract claim will be denied; and (3) Forja will be permitted to seek lost profits only as a facet of the expectation damages affiliated with its surviving counterclaim.

## I.    BACKGROUND

Volvo builds commercial trucks; Forja makes component parts.  In 2006, the parties entered into a Purchase Agreement, whereby Volvo agreed to purchase, and Forja agreed to supply, front axle beams for use in Volvo's vehicles.  (ECF No. 139-2.)  The Purchase Agreement incorporated by reference several other agreements—most notably Volvo's General Purchasing Conditions (the "GPCs") and a Price Agreement[2]—which, taken together, governed the parties' contractual relationship.  (*See* ECF Nos. 139-2 § 2.1; 139-1, -4, -8, -10.) Any conflicting language in the agreements would be resolved by the hierarchy set out in Section 2.2 of the Purchase Agreement: when provisions were at odds, the terms of the operative Price Agreement would take precedence, followed by those of the Purchase Agreement itself, followed further by the GPCs.  (ECF No. 139-2 § 2.2.)  The parties operated under this layered contract until Volvo unilaterally terminated the Purchase Agreement by letter dated February 15, 2016.  (ECF No. 135-30.)  Volvo filed this action for breach of contract against Forja that same day.  (ECF No. 1.)

---

[2] Per the Purchase Agreement, "subsequently issued" versions of these documents, including the Price Agreement, prevailed over previous iterations.  (ECF No. 139-2 § 2.2.)  The parties' Price Agreement was originated in 2006 (the "2006 Price Agreement"); partially modified in 2010 (the "2010 Price Agreement"); and wholly superseded by a new version in 2015 (the "2015 Price Agreement").  (ECF Nos. 139-1, -4, -8.)

At the heart of Volvo's complaint is the allegation that, due in part to mechanical failures at its forges,[3] Forja consistently "f[ell] short of its production and delivery" obligations throughout 2014 and 2015. (*See, e.g.*, ECF Nos. 1 ¶¶ 10–11; 135-10 at 2; 135-17.) To avoid assembly disruptions during this time, Volvo asked Forja to arrange for expedited shipping of axle beams by air freight. (*See* ECF Nos. 135-21 at 3, -22 at 5.) Forja refused. (ECF No. 135-21 at 2.) Volvo agreed to cover the cost of expedited shipping—allegedly "[o]ut of necessity and duress"—but never "t[ook] responsibility [for] causing the need for [the] expedite[d] air freight charges." (ECF No. 135-22 at 5.) As the cumulative expedited shipping costs were substantial, Volvo now seeks reimbursement. (*See* ECF No. 1 ¶¶ 29–30.)

Forja maintains that it had no responsibility to pay for air freight. (*See* ECF No. 150 at 22–27.) With respect to charges incurred in 2014, Forja's main argument is contractual; that the parties made a "deliberate decision to exclude [an] expedited delivery [obligation]" from the version of their agreement in effect at that time. (*Id.* at 24.) In contrast, Forja's position with respect to charges incurred in 2015 is factual. Although the express terms of the 2015 Price Agreement obligated Forja to cover expedited delivery charges, (ECF No. 139-8 § 10.1), Forja contends that air freight was only necessary in light of the "frequency and magnitude of the fluctuations in Volvo's forecasts," which "no reasonable manufacturer . . . using its best efforts" could have satisfied, (*see* ECF No. 150 at 15). Put another way, "the expedited delivery charges Volvo incurred were not *caused* by Forja." (*Id.* at 26 (emphasis added) (capitalization altered).)

---

[3] A forge is a furnace used for melting or refining metals. *Oxford English Dictionary Online*, available at https://www.oed.com/view/Entry/73304?result=1&rskey=txNj76& (last visited Nov. 24, 2019).

In addition to these defenses, Forja has filed three counterclaims related to its contractual relationship with Volvo. (ECF No. 111 at 24–26.) First, Forja contends that Volvo breached the parties' contract when it terminated the Purchase Agreement "effective immediately," thereby "depriving Forja of the benefit of the bargain it would have obtained" had Volvo remained in the contract. (*Id.* at 24.) Second, Forja alleges that Volvo fraudulently induced it to enter into the 2015 Price Agreement by conveying an intent to continue the parties' long-term relationship, despite having already decided to abandon Forja for a competing beam supplier, Bharat Forge Ltd. ("Bharat"). (*Id.* at 21, 24–25.) Third, Forja claims that, by sourcing beams from Bharat prior to terminating the Purchase Agreement, Volvo violated an obligation to purchase its requirements exclusively from Forja. (*Id.* at 25–26.)

After extensive discovery and full briefing, the Court considers the parties' cross-motions for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Familiar as this rule may be, "[a] court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992). "First, it must be determined if the agreement is ambiguous or unambiguous on its face." *Teamsters Local 391 v. Ball Corp.*, 355 F. Supp. 2d 803, 809 (M.D.N.C. 2005). If the plain language of the agreement unambiguously resolves a dispositive issue, then the court may "properly interpret the contract as a matter of law and grant summary judgment." *World-Wide*, 955 F.2d at 245. Even when the contract is facially ambiguous, a court may still grant summary judgment if, after examining "evidence extrinsic

to the contract that is included in the summary judgment materials," the court determines that "the evidence is, as a matter of law, dispositive of the interpretative issue." *Id.* If, however, "resort to extrinsic evidence in the . . . materials leaves genuine issues of fact" unresolved, "summary judgment must . . . be refused and interpretation left to the trier of fact." *See Teamsters*, 355 F. Supp. 2d at 809 (quoting *World-Wide*, 955 F.2d at 245).

Consistent with the choice-of-law clause in the parties' Purchase Agreement, New York law governs all of the claims in this case. (*See* ECF Nos. 193 at 13; 139-2 § 6.1.11.) The courts of that state employ a similar methodology when interpreting contracts at summary judgment: unambiguous contracts may be interpreted by the court as a matter of law, whereas ambiguous language should be left to the fact finder, barring extrinsic evidence presented by the parties that clearly "resolves any ambiguity."[4] *See 82-11 Queens Blvd. Realty, Corp. v. Sunoco, Inc. (R&M)*, 951 F. Supp. 2d 376, 381–82 (E.D.N.Y. 2013) (collecting cases). It is always the case, however, that "[w]here the terms of an agreement are clear and unambiguous, the Court will not look beyond the 'four corners' of the agreement, and parol evidence of the parties' intentions is inadmissible." *See S. N.J. Rail Grp., LLC v. Lumbermens Mut. Cas. Co.*, No. 06 Civ. 4946 (LAK) (AJP), 2007 WL 2296506, at *7 (S.D.N.Y. Aug. 13, 2007); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002) (affirming the "sound rule" that "when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms").

---

[4] Summary judgment is also appropriate where "the contract is ambiguous but the opposing party fails to tender extrinsic evidence supporting its proposed interpretation." *See 82-11 Queens Blvd. Realty Corp.*, 951 F. Supp. 2d at 382. However, because the parties in this case have both tendered evidence supporting their preferred interpretations, this rule does not apply.

## III.  DISCUSSION

The parties are sophisticated commercial entities.  While the contours of their agreement shifted throughout their ten-year relationship, it is possible to determine, at any given point, which terms were in effect and which had been superseded or modified.  As explained below, several of the claims can be resolved at this stage by the plain language of the contract and New York law.  For others, though the relevant contractual provisions are clear, lingering factual disputes—such as whether a "material breach" in fact occurred—preclude summary judgment.  Each of the four claims will be addressed in turn.[5]

### A.  Forja's Exclusivity Counterclaim

The unambiguous language of the contract resolves Forja's exclusivity claim.  Volvo could not have "breached the Purchase Agreement," as Forja contends, "when it purchased axle beams from another supplier, Bharat, in January and February 2016," (ECF No. 111 at 26), because it was under no obligation to source exclusively from Forja at that time.  "Requirements" contracts obligate a buyer to buy exclusively from a single seller.  *See MDC Corp., Inc. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 392 (S.D.N.Y. 2002) (citing 1 W. Hawkland, *UCC Series* § 2-306:3 (2001) ("By their very nature, output and requirements

---

[5] Pursuant to Federal Rule of Civil Procedure 56, as amended, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Importantly, "the objection now contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be."  *See Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 472 n.2 (D. Md. 2013) (internal citation omitted).  In the briefing accompanying their motions for summary judgment, the parties make (and respond to) a number of evidentiary objections.  (*See, e.g.*, ECF Nos. 158 at 15; 161 at 11–12; 163; 167 at 11, 14–15; 168.)  The Court has considered the form and merit of each objection and concludes that all must be overruled at this stage—either due to a lack of specificity in the objection or because the proponent has satisfactorily explained how the evidence could be presented in an admissible form at trial.

contracts involve exclusive dealing.")); *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 192 (E.D.N.Y. 1986). The parties agree that Section 2.1 of the Purchase Agreement, which bound Volvo to purchase "its requirements" of axle beams from Forja, mandated exclusive dealing. (*See* ECF Nos. 139-2 § 2.1; 153 at 9; 167 at 12.) However, as discussed above, the terms of the Purchase Agreement could be overridden by conflicting language in the operative Price Agreement. (*See* ECF No. 139-2 § 2.2.) In line with the Purchase Agreement's requirements provision, the 2006 and 2010 Price Agreements stated that Volvo agreed to purchase "100% of their front axle I-beam[s]" from Forja. (ECF Nos. 139-1 § 2.1; 139-4 § 2.1.) The 2015 Price Agreement, however,—which "replace[d] and supersede[d]" the previous iterations and was operative at the time of the alleged breach—only required Forja to supply "a minimum of 4500 [b]eams per month" for the 2015 calendar year, and further stated that "[b]eginning [with the] 2016 calendar year," the parties would "mutually agree to a leveled quantity forecast" for delivery "every 6 months." (ECF No. 139-8 §§ 1.1, 10.2.)

Forja contends that "[t]he 2015 Price Agreement contains no term that abrogates or otherwise modifies Section 2.1 of the Purchase Agreement." (ECF No. 153 at 21.) However, Section 10.2 of the 2015 Price Agreement specifically addressed quantity, in direct conflict with (and, per the established hierarchy, superior to) the Purchase Agreement's requirements term. As Volvo rightly points out, "Section 10.2 [of the 2015 Price Agreement] does not require Forja to supply *any* beams beyond 2015." (ECF No. 161 at 3.) Rather, in stark contrast to the blanket "100%" requirements terms used before, the parties chose under the 2015 Price Agreement to negotiate quantity on a biannual basis—without any obligation for Volvo to buy

or Forja to sell.[6]  As Volvo was free to seek all, none, or some of its axle beams from Forja in 2016, Forja's claim that Volvo violated an obligation to purchase its requirements exclusively from Forja must fail.

### B. Forja's Early Termination Counterclaim

The contract included several mechanisms by which the parties could prematurely terminate their relationship.  First, Section 24.3 of the GPCs provided for termination in the event of material noncompliance:

> If a Party fails to comply in any material respect with its obligations under the Purchase Agreement and does not undertake complete rectification within thirty (30) days after a written notice to that effect, the other Party shall be entitled to terminate the Purchase Agreement with immediate effect and receive compensation in accordance with the provisions of the Purchase Agreement.

(ECF No. 139-10 § 24.3.)  Next, Section 6.1.13 of the Purchase Agreement permitted Volvo to terminate the contract if Forja's delivery of parts was deemed "no longer competitive," provided that the parties could not agree on a solution within thirty days and an additional sixteen weeks' notice was provided to Forja.  (ECF No. 139-2 § 6.1.13.)  Further, Section 8 of the Purchase Agreement allowed either party to terminate the agreement for any reason with twelve months' notice.  (*Id.* § 8.)

In its February 15, 2016 termination letter, Volvo asserted that, due to Forja's "fail[ure] to meet its delivery obligations under the Purchase Agreement," the parties' relationship would be "terminated *effective immediately* . . . pursuant to Section 24.3 of [the GPCs]."  (ECF No. 135-30 at 2 (emphasis added).)  Forja claims that this method of termination was improper.  (ECF

---

[6] The Court notes that the 2015 Price Agreement does not contain any separate language explicitly preserving exclusivity between the parties.  (ECF No. 139-8.)

No. 111 at 24.)  In support of its claim, it directs the Court to Section 12 of the 2015 Price Agreement, which states that "[t]his Price Agreement may be early-terminated in accordance with Section 8 and 6.1.13 of the Purchase Agreement."  (*See* ECF Nos. 139-8 § 12; 153 at 21.) Forja argues that this early termination provision "supersede[d] Section 24.3 of the GPCs" by virtue of the Purchase Agreement's hierarchy and, therefore, outlined the only methods of early termination available to Volvo in 2016.  (*See* ECF No. 153 at 18.)  The Court disagrees.

Unlike the conflicting quantity provisions discussed above, which conclusively established that the parties' agreement was non-exclusive in 2016, the early-termination language in the 2015 Price Agreement is *permissive*.  By its terms, the parties "may" have terminated the 2015 Price Agreement in line with Sections 6.1.13 and 8 of the Purchase Agreement.  (ECF No. 139-8 § 12.)  However, nothing in Section 12—nor anywhere else in the 2015 Price Agreement—prohibited termination by way of Section 24.3 of the GPCs, which remained in effect throughout the duration of the parties' relationship.[7]  (*Cf.* ECF No. 139-2 §§ 6–6.3.1 (specifically altering certain portions of the GPCs, but leaving Section 24.3 untouched).)  Moreover, Sections 6.1.13 and 8 of the Purchase Agreement laid out specific contingencies supporting early termination—either Forja's parts were no longer competitive, or one of the parties became willing to endure a twelve-month notice period prior to exiting. (*See* ECF No. 139-2 §§ 6.1.13, 8.)  Neither of those provisions addressed the wholly different scenario anticipated by Section 24.3 of the GPCs: termination in the event of a material breach. (*See* ECF No. 139-10 § 24.3.)  Absent language limiting or conflicting with that safeguard, the

---

[7] Although Section 8 of the Purchase Agreement "replaced" Section 33 of the GPCs, it also stipulated that "[c]ertain provisions shall due to their nature continue to remain in force as applicable."  (*See* ECF No. 139-2 § 8.)  Accordingly, the Court will not construe Section 8 of the Purchase Agreement as impacting other provisions of the GPCs.

Court agrees with Volvo that termination pursuant to Section 24.3 of the GPCs remained available to it at the time of its termination letter.

The fact that Volvo had the power to terminate via Section 24.3 of the GPCs, however, does not answer whether it complied with that section in issuing its termination letter. Termination was proper under Section 24.3 of the GPCs when three conditions were met: (1) a party "fail[ed] to comply in any material respect with its obligations under the Purchase Agreement"; (2) the other party provided "a written notice to that effect"; and (3) the noncompliant party failed to "undertake complete rectification within thirty (30) days" of receiving said notice. (*See id.*)

There is some debate as to whether Forja failed to comply in any "material respect" with its contractual obligations in 2013–14 and, if it did, whether Volvo properly provided "written notice to that effect." Under the operative terms of the parties' agreement at that time, Forja was required to maintain a minimum safety stock of finished goods in a U.S-based warehouse to ensure that Volvo would have ready access to beams regardless of supply fluctuations. (*See* ECF 139-4 § 4.) The record shows, and Forja does not dispute, that the safety stock sometimes fell below required levels during late 2013 and 2014. (*See, e.g.*, ECF Nos. 135-13 at 2–3; 135-14 at 2; 135-16 at 2.) Further, on at least two occasions in 2014, Volvo sent formal "Preventive Warning Notification Letters" informing Forja that its failure "to meet weekly EDI requirements . . . and recovery plans to rebuild safety stock" placed it in "jeopardy."[8] (ECF No. 135-15 at 2, 5.) On their face, these failures and accompanying notices would appear to justify early termination pursuant to Section 24.3 of the GPCs.

---

[8] Volvo has also submitted a third "Preventive Warning Notification Letter," dated June 6, 2014, which addresses Forja's alleged failure to "explain delivery failures with air and land transports." (ECF No. 135-15 at 4.)

However, Forja insists that the depletion of safety stock was not its fault; rather, the "frequency and magnitude of the fluctuations in Volvo's forecasts" during the relevant time period were allegedly so unreasonable that no manufacturer "using its best efforts" could have fulfilled them. (ECF No. 153 at 13.) Under the section of New York's Universal Commercial Code governing requirements contracts—which, as explained above, the parties had in 2013 and 2014—a buyer may not demand any "quantity unreasonably disproportionate to any stated estimate or . . . normal or otherwise comparable prior output or requirements." *See* N.Y.U.C.C. § 2-306(1). Along those lines, Forja has tendered evidence in the form of an expert report by Professor Daniel Snow ("Dr. Snow").[9] Dr. Snow analyzed the parties' week-to-week "forecast and shipment data" from 2013 to 2015 and concluded that, "[b]ased on [his] experience, . . . [he] would not expect a reasonable manufacturer to be able to satisfy such substantial and frequent demand fluctuations immediately before the shipment date." (ECF No. 140-1 at 6, 29.) By casting doubt on Forja's responsibility for the diminished safety stock, this evidence creates a question of fact as to whether Forja failed to comply with the parties' agreement in a "material respect," as required under Section 24.3 of the GPCs.

Volvo counters that the parties' agreement anticipated "major" fluctuations but, nevertheless, required that "all efforts would be made to meet [its] schedules, notwithstanding any such deviations." (*See* ECF No. 139-4 § 4.) However, the agreement and related evidence do not appear to definitely speak to instances of truly unreasonable (as opposed to relatively "major") forecast variations. In light of this ambiguity and the evidence offered by Forja, the

---

[9] Dr. Snow is an Associate Professor of Technology and Operations Management at Oxford University's Saïd Business School and an Official Fellow at Oxford's Exeter College. (ECF No. 140-1 at 4.)

Court concludes that a genuine issue of fact remains as to the reasonableness of Volvo's forecasts and, therefore, as to whether Forja failed to comply in any "material respect" with its contractual obligations in 2013–14.

Further, there is conflicting evidence in the record as to whether the "Preventive Warning Notification Letters" issued by Volvo satisfied Section 24.3's notice requirement. On the one hand, the letters addressed alleged instances of noncompliance and demanded that Forja "implement immediate actions to contain and improve [its] negative performance trend." (ECF No. 135-15 at 2, 5.) On the other, the tone of the letters was, at times, vague and conditional—for example, informing Forja that, because its performance was "moving into the wrong direction," it was in "jeopardy to get into the Volvo Low Performing Supplier . . . improvement process," but not going so far as to threaten termination. (*Id.*) Moreover, Forja has produced evidence demonstrating that, despite having received these warnings, it was never designated as a "supplier[ ] that actually cause[d] [b]reak down [or] missing parts in production" in Volvo's performance-evaluation system. (ECF No. 154-21 at 2–4.)

The case for termination based on material noncompliance occurring in 2015 is stronger, but still not dispositive. Unlike the open-ended "requirements" provisions which governed the parties' relationship in 2013–14, the 2015 Price Agreement specifically obligated Forja to "supply Volvo with a minimum of 4500 beams per month for the entire 2015 calendar year." (ECF No. 139-8 § 10.2 (capitalization altered).) The evidence shows that Forja delivered fewer than 4,500 beams for seven consecutive months between February and August of 2015. (*See* ECF No. 135-26 at 2.) Furthermore, the Court is satisfied that Volvo's February 15, 2016 termination letter, which clearly states that "Forja has materially breached numerous

provisions of the parties' Purchase Agreement," met Section 24.3's notice requirement. (*Compare* ECF No. 135-15, *with* ECF No. 135-30.)

Nonetheless, there remains an outstanding question as to whether Forja's 2015 delivery failures should be considered "material." While the quantity of beams delivered fell below the 4,500-part minimum, Forja attempted to correct its deficit by delivering beams well in excess of that number in at least September and October of 2015. (*See* ECF No. 135-26 at 2 (documenting delivery quantities for those months as 5,888 and 5,979, respectively).) According to Volvo's purchasing manager, these "catch-up" deliveries created "excess inventory," such that Volvo would be unlikely to need "any Forja beams" in January and February 2016. (*Id.*) Section 24.3 of the GPCs contemplated this kind of "rectification." (*See* ECF No. 139-10 § 24.3)

In sum, the Court concludes that termination pursuant to Section 24.3 of the GPCs was available to Volvo in 2016, so long as Volvo complied with its terms. However, given that there remain factual disputes as to whether (1) Forja "fail[ed] to comply in any material respect with its obligations" and (2) whether Volvo provided adequate "notice to that effect," the Court cannot rule as a matter of law that Volvo's immediate termination was proper. Accordingly, the parties' cross-motions for summary judgment on Forja's improper termination claim are denied.

### C. Forja's Fraudulent Inducement Counterclaim

In its final counterclaim, Forja alleges that Volvo induced it into the 2015 Price Agreement, despite "never intend[ing] to perform under the agreement." (ECF No. 111 at 17.) Fraudulent inducement is a species of fraud which "arises from a promisor's successful attempts to induce a promisee to enter into a contractual relationship despite the fact that the

promisor harbored an undisclosed intention not to perform under the contract." *Barrie House Coffee Co. Inc. v. Teampac, LLC,* No. 13-CV-8230 (VB), 2016 WL 3645199, at *7 (S.D.N.Y. June 30, 2016) (quoting *Neckles Builders, Inc. v. Turner*, 986 N.Y.S.2d 494, 497 (App. Div. 2014)). Although breach of contract and fraudulent inducement are conceptually distinct actions, "[i]t is black letter law in New York that a claim for [fraudulent inducement] will not lie if the claim is duplicative of a claim for breach of contract." *Clifton v. Vista Computer Servs., LLC,* No. 01 Civ. 10206 (JSM), 2002 WL 1585550, at *2 (S.D.N.Y. July 16, 2002) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19–20 (2d Cir. 1996)). "[N]ot every fraud claim is foreclosed in an action also involving a contract," *see Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d. Cir. 2006), but to be viable, "a fraud claim . . . [must] be sufficiently distinct from the breach of contract claim." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 306–07 (S.D.N.Y. 2010) (quoting *Bridgestone/Firestone*, 98 F.3d at 20).

In *Bridgestone/Firestone*, the Second Circuit surveyed New York case law and determined that, to be "sufficiently distinct" to withstand dismissal, a fraudulent inducement claim must demonstrate either: (1) "a legal duty separate from the duty to perform under the contract"; (2) "a fraudulent misrepresentation collateral or extraneous to the contract"; or (3) "special damages that are caused by the misrepresentation and unrecoverable as contract damages."[10] *See* 98 F.3d at 20. Forja's claim does not meet any of these exceptions.

---

[10] The Court acknowledges that there is "some confusion in the New York case law regarding the rule adhered to in *Bridgestone/Firestone*." *See Marriott Int'l, Inc. v. Downtown Athletic Club of N.Y.C., Inc.*, No. 02 Civ. 3906 (MBM), 2003 WL 21314056, at *6 n.3 (S.D.N.Y. June 9, 2003). As the Southern District of New York has explained,

> The rule derives from a very long and very puzzling line of New York cases. On at least four occasions, New York's Court of Appeals has expressly held that "a contractual promise made with the undisclosed intention not to perform it constitutes fraud." At the same time,

14

First, as Volvo notes, "Forja has not alleged a separate legal duty, apart from the contracts, and none exists." (ECF No. 138 at 19.) In a footnote to its responsive briefing, Forja argues that "the record . . . supports the existence of a 'separate legal duty' by Volvo to disclose because Volvo had superior knowledge of its agreement with Bharat" when negotiating the 2015 Price Agreement. (ECF No. 153 at 26 n.12.) However, whatever "superior knowledge" Volvo had of its dealings with Bharat was irrelevant to the 2015 Price Agreement, which did away with exclusivity between the parties. Standing alone, "the intention to breach does not give rise to a duty to disclose"—even if the anticipated breach entails a shift toward a competitor. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d. Cir 2005).

Second, Forja has not shown that Volvo made any material misrepresentations that were "collateral to the subject matter of the contract." *See Oliver Wyman, Inc. v. Eielson*, No. 15 Civ. 5305 (RJS), 2016 WL 5339549, at *6 (S.D.N.Y. Sept. 22, 2016). Under New York law, "a promissory statement of what will be done in the future" may support a breach-of-contract claim, whereas a claim for fraudulent inducement depends on "a misrepresentation of a

_____

however, there are numerous Appellate Division cases that state precisely the opposite rule.

*Id.* (citation omitted). Federal courts in the Second Circuit "have resolved the conflict between the state cases by following the Appellate Division's rule and crafting fact-specific exceptions that account for the Court of Appeals' decisions." *Id.* Recent decisions by the Appellate Division of the New York Supreme Court also support application of the *Bridgestone/Firestone* rule. *See, e.g., Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 191 (App. Div. 2017) (adhering to "the rule that a false promise is actionable as fraud only if the promised performance is outside the terms of any contract between the parties"). Because it appears most likely that the *Bridgestone/Firestone* rule would have been applied had this case been brought in state trial court in New York, the Court will apply it here. *See Best W. Int'l, Inc. v. CSI Int'l Corp.*, No. 94 Civ. 0360 (LMM), 1994 WL 465905, at *5 (S.D.N.Y. Aug. 23, 1994) (adopting the precursor to the *Bridgestone/Firestone* rule "since that is presumably the reasoning which would be applied to [a fraudulent inducement] claim were it brought in New York State Supreme Court").

present fact" foreign to the contract itself. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007); *see also First Bank of Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (App. Div. 1999). Forja alleges that Volvo made two representations that, it believes, were clearly collateral to the parties' contract: (1) that Volvo was "contemplating providing Forja with its Brazilian beam business"; and (2) that Volvo implied it would not seek to recoup expedited freight charges by stating that "anything that may have happened in the past . . . it's in the past, and we're not going to address it anymore. (*See* ECF Nos. 153 at 17, 26; 154-8 at 110:16–25.) However, having reviewed the statements Forja cites in evidence to support these alleged misrepresentations, the Court agrees with Volvo that they are "too generic to be actionable." (*See* ECF Nos. 154-3 at 367:07–369:13; 154-6 at 302:14–304:13, 347:25–348:20, 349:4–15, 359:13–363:1; 154-8 at 110:16–111:25; 154-22; 161 at 9.)

Third, Forja does not seek any "special damages" in connection with its fraudulent inducement claim that would be "unrecoverable as contract damages." *Bridgestone/Firestone*, 98 F.3d at 20. "A general request for punitive damages is not enough to differentiate the damages recoverable for fraud from those sought for breach of contract." *Sekisui Am. Corp. v. Hart*, No. 12 Civ. 3479 (SAS), 2012 WL 5039682, at *3 (S.D.N.Y. Oct. 17, 2012). Nor can Forja manufacture a sufficient distinction by pursuing out-of-pocket damages on its fraudulent inducement claim while disclaiming the same damages for its breach-of-contract claims. (*See* ECF No. 153 at 26–27.) Out-of-pocket damages are recoverable "as contract damages," whether Forja elects to pursue them or not. *See Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 431 (S.D.N.Y. 2004) (rejecting "defendants' assertion that damages flowing from costs expended in reliance on the contract could, in fact, be fraud-based damages"). Simply put, Forja has not sought any damages which can rightly be classified as

"special consequence[s] of the fraud," separate from damages it "can claim because of the alleged breach of contract." *See id.* at 430 (citing *Deerfield Comm'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986)).

Thus, because Forja has not alleged a fraudulent inducement claim "sufficiently distinct" from its breach-of-contract claim, *see Bridgestone/Firestone*, 98 F.3d at 20, summary judgment must be granted for Volvo.

### D. Punitive and Lost-Profits Damages for Forja's Claims

Volvo further moves for for summary judgment on the punitive damages and lost profits sought by Forja in connection with its counterclaims. (*See* ECF No. 111 at 26; 213-1 at 9.) Under New York law, punitive damages are not recoverable for an "ordinary breach of contract." *Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 634 N.E.2d 940, 943 (N.Y. 1994). So long as an action "has its genesis in the contractual relationship between the parties," a claimant may not recover punitive damages unless it can establish that the opposing party's conduct: "(1) is actionable as an independent tort; (2) was sufficiently egregious; and (3) was directed not only against the plaintiff, but was part of a pattern of behavior aimed at the public generally." *See Leviton Mfg. Co., Inc. v. Reeve*, 942 F. Supp. 2d 244, 270 (E.D.N.Y. 2013) (citing *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995); *Rocanova*, 634 N.E.2d at 943–44).

Forja cannot satisfy any of these preconditions. As explained above, Forja's fraudulent inducement claim is duplicative of its breach claims and, therefore, "not actionable as an independent tort." (*See supra* Section III.C.) Regardless, the evidence presented does not

demonstrate that Volvo's conduct was "sufficiently egregious"[11] or part of a trend of behavior "aimed at the public generally." The "[m]ere intent not to fulfill contractual promises," as alleged by Forja, "will not support a claim for punitive damages." *Ventus Networks*, 2007 WL 582736, at *3. Accordingly, punitive damages are unavailable.

Turning to the issue of lost profits: Among the damages sought in its initial disclosures, Forja made claim to lost profits in the amount of $21,418,000. (*See* ECF No. 154-44 at 7.) Volvo posits, however, that during a January 25, 2019 motions hearing, Forja "unreservedly stipulated it would not seek lost profits in this case" in exchange for not having to share certain financial records requested by Volvo. (ECF No. 138 at 24–26.) Without restating the entire colloquy between Forja's counsel and the Court, the key interaction was this:

> THE COURT: So is it fair to say then, we can accept that as an amendment of the initial disclosures to no longer be claiming the lost profits?
>
> MR. FARIDI: Yes. And, Your Honor, we will formally amend the initial disclosures at a particular juncture . . . and they will see that . . . we are not seeking $21 million for lost profits.
>
> THE COURT: All right. And I take your point you'll formally amend as to whatever other issues you may have, but for today's purposes, I would accept that as an amendment to delete the claim for lost profits as part of your initial disclosures, and I don't know if there is some other place that you may have included that, but disclaim any intent to seek damages for lost profits at this point?
>
> MR. FARIDI: That's correct, Your Honor.

---

[11] "To establish that a defendant's fraudulent conduct was sufficiently egregious . . . a plaintiff must allege facts that evince a 'high degree of moral turpitude' or 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Ventus Networks, LLC v. Answerthink, Inc.*, No. 05 Civ. 10316 (DAB), 2007 WL 582736, at *3 (S.D.N.Y. Feb. 22, 2007) (citing *Rocanova*, 634 N.E.2d at 943).

(ECF No. 154-43 at 5.) Based on this "proffer and stipulation that Defendant Forja [was] no longer seeking lost profits," the Court agreed to deny Volvo's motion to compel the production of the financial records. (*Id.* at 6.)

Volvo argues that this oral stipulation should apply to *all* lost profits sought by Forja. (ECF No. 138 at 24–26.) However, it is clear to this Court that what Forja meant to disclaim— and what the Court understood it to disclaim—were the specific, line-item lost profits laid out in its initial disclosures. (*Compare* ECF No. 154-44 at 6 (seeking "[l]ost profits in the amount of approximately $21,418,000"), *with* ECF No. 154-43 at 5 ("[W]e are not seeking $21 million for lost profits.").) To the extent Forja seeks lost profits as a component of general damages tied to its early-termination claim, it is still free to do so—after all, such damages "are precisely what [Forja] bargained for, and only an award of damages equal to lost profits will put [Forja] in the same position [it] would have occupied had the contract been performed." *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109–10 (2d. Cir. 2007).

### E. Volvo's Breach-of-Contract Claim

Finally, the Court considers Forja's motion for summary judgment on Volvo's original breach-of-contract claim. Once again, the unambiguous language of the agreement makes it clear that Volvo is on sound contractual footing in pursuing recovery. Section 4.5 of the 2006 Price Agreement established that Forja would "compensate [Volvo] for any delivery costs incurred due to [Forja's] failure to meet the production and delivery requirements." (ECF No. 139-1 § 4.5.) The 2010 Price agreement "modified" certain portions of the 2006 Price Agreement,[12] but left Section 4.5 intact. (*See* ECF No. 139-4.) The 2006-as-modified-by-2010

---

[12] Technically, the 2010 Price Agreement modified the Purchase Agreement, which incorporates the terms of the 2006 Price Agreement. (*See* ECF Nos. 139-2 § 2.1; 139-4 at 2.)

Price Agreement remained in effect until the parties adopted the 2015 Price Agreement, which "replace[d] and supersede[d]" its predecessor in its entirety. (*See* ECF No. 139-8 § 1.1.) And, under that document, Forja was responsible for "any and all costs associated" with "expedite[d] shipments" tied to its inability to meet Volvo's demand schedules. (*Id.* § 10.1.)

Thus, throughout the parties' relationship, the operative Price Agreements obligated Forja to cover any unforeseen delivery-related expenses that it caused. Forja does not dispute that it bore this responsibility under the 2015 Price Agreement. However, it argues that it was *not* obligated to pay expedited delivery costs in 2014 because Section 4.5 of the 2006 Price Agreement "ceased to be effective" when the parties entered into a "new and superseding contract, the 2010 Price Agreement." (ECF No. 150 at 6.) On this point, Forja misconstrues the nature and effect of the 2010 Price Agreement. As explained above, the 2010 Price Agreement "modifie[d]," rather than superseded, the terms of the 2006 Price Agreement. (ECF No. 139-4 at 2.) The purpose of a modification is to "abridge or amend" an existing agreement while "leav[ing] intact those provisions of the original agreement that are not directly inconsistent." *See United States v. Agnello*, 344 F. Supp. 2d 360, 368 (E.D.N.Y. 2003); *see also Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 717–18 (App. Div. 1980) ("The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of it intact."). While it is true that "the 2010 Price Agreement did not contain the clause from the 2006 Price Agreement" pertaining to delivery costs, (*see* ECF No. 150 at 6), the failure to address a term in a modifying document should not be construed as an intent to excise it. Indeed, a foundational feature of the parties' agreement in this case was that, once in effect, contractual provisions survived unless expressly modified, superseded, or trumped

by a superior term. (*See* ECF No. 139-2 § 2.2.) The parties clearly understood how to supersede portions of their agreement—they did just that in the 2015 Price Agreement. (*See* ECF No. 139-8 § 1.1.) However, by its plain terms, the 2010 Price Agreement did not alter or eliminate Section 4.5 of the 2006 Price Agreement.

Forja further contends that the 2006 Price Agreement "expired" in 2010, thereby relieving Forja of any obligations not specifically addressed in a subsequent Price Agreement. (*See* ECF No. 150 at 9.) However, a close reading of the contract reveals that the durational language contained in the 2006 Price Agreement applied only to that document's price terms. Section 2.1 of the 2006 Price Agreement provided that Forja would "undertake[ ] to provide Volvo with [beams] at the following prices from January 1st, 2006 through December 31st, 2010." (*See* ECF No 139-1 § 2.1.) In contrast, 4.5 of the 2006 Price Agreement contains no reference to expiration. Further, in a departure from the provision-specific dating used in 2006, both subsequent Price Agreements contained durational language applying to their respective documents *as a whole*. (*See* ECF Nos. 139-4 § 6 ("This agreement is valid from July 1st, 2010 through December 31st, 2013."); 139-8 § 12 ("This Price Agreement is valid for a 5-year term, beginning on January 1, 2015 and expiring on December 31, 2019 unless earlier terminated as allowed herein.").) Had the parties intended for the 2006 Price Agreement to expire in its entirety in 2010, they easily could have said so.

It is therefore clear that, under the terms of the parties' agreement, Forja was obligated to pay expedited shipping costs attributable to its own production or delivery failures.[13]

---

[13] Volvo argues that it is also entitled to recover expedited shipping charges pursuant to Sections 21.3, 23, and 24.2 of the GPCs. (*See* ECF No. 158 at 17.) However, because the Court concludes that Sections 4.5. of the 2006 Price Agreement and 10.1 of the 2015 Price Agreement provide an adequate contractual basis for recovery, it need not address those arguments at this time.

However, as with Forja's early-termination claim, (*see supra* Section III.B), a factual dispute remains over whether Forja or Volvo created the need for expedited shipping. If the need for expedited shipping arose only as a result of Volvo's unreasonably fluctuating forecasts, (*see, e.g.*, ECF No. 140-1 at 29), then Forja would not be required to cover those costs under the contract. However, if, as Volvo alleges, the delays were Forja's fault, then recovery would be warranted. (*See, e.g.*, ECF Nos. 159-9; 159-11 at 104:22–105-14; 159-16 at 2; 159-17 at 6–16.) Because the parties have presented conflicting evidence on this material issue, resolution of Volvo's breach-of-contract claim must be done at trial.

## IV. CONCLUSION

To summarize, Forja's counterclaim for breach of exclusivity fails because the parties' relationship was not exclusive at the time Volvo terminated their agreement. Forja's fraudulent inducement counterclaim likewise fails, because, under New York law, it is insufficiently distinct from Forja's breach-of-contract claims. As it relates to Forja's improper termination claim, the Court concludes that termination under Section 24.3 of the GPCs was available to Volvo, but that remaining factual disputes—whether Forja failed to comply with its contractual obligations in a "material respect," and, if so, whether Volvo provided adequate notice thereof—preclude summary judgment. For similar reasons, summary judgment on Volvo's original breach-of-contract claim is also inappropriate. Lastly, on the issue of damages, Forja may not seek punitive damages in this case, but may pursue lost profits which reflect the general expectation damages affiliated with its surviving counterclaim.

For the reasons stated herein, the Court enters the following:

**[ORDER TO FOLLOW ON NEXT PAGE]**

**ORDER**

IT IS THEREFORE ORDERED that Volvo's motion for summary judgment, (ECF No. 135), is GRANTED IN PART AND DENIED IN PART. Volvo's motion is GRANTED as to Forja's claims for breach of exclusivity, fraudulent inducement, and punitive damages. Volvo's motion is DENIED as to Forja's improper termination claim, as well as to Forja's pursuit of lost profits as a component of general expectation damages.

IT IS FURTHER ORDERED that Forja's motion for summary judgment, (ECF No. 149), is DENIED as to all claims.

This, the 25th day of November 2019.

/s/ Loretta C. Biggs
United States District Judge